UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
DAVID WIGGINS,                          :
                                        :     10 Civ. 4098(DLC)
                    Plaintiff,          :
                                        :     OPINION AND ORDER
          -v-                           :
                                        :
HAIN PURE PROTEIN CORPORATION,          :
                                        :
                    Defendant.          :
                                        :
----------------------------------------X

Appearances:

For plaintiff:

Edward Hernstadt
Hernstadt Atlas, LLP
11 Broadway
Suite 615
New York, NY 10004

For defendant:

Robert P. Lynn, Jr.
Stephen William Livingston
Lynn, Gartner & Dunne, LLP
330 Old Country Road, Suite 103
Mineola, NY 11501

DENISE COTE, District Judge:

        Plaintiff David Wiggins ("Wiggins") brings this action

against his former employer, Hain Pure Protein Corporation

("HPPC"), for breach of contract and violation of the New York

Labor Law.  Wiggins was fired in April of 2009 and seeks payment

of a 2008 bonus, severance pay, rights in an equity plan, and

payment for unused vacation.  Following the close of discovery, HPPC filed a motion for summary judgment on May 27, 2011.  For the following reasons, HPPC's motion for summary judgment is granted.[1]

BACKGROUND

I.   The Formation of HPPC and Hiring of Wiggins as CEO

The following facts are undisputed unless otherwise indicated.  Prior to the time period at issue here, Wiggins was retained as a consultant by Pegasus Capital Advisors, L.P. ("Pegasus"), a private equity firm.  One of Wiggins's tasks for Pegasus was advising it on the acquisition of the College Hill Division of Premium Pure Protein.  Around July 2005, Pegasus and Hain Celestial Group, Inc. ("Hain") entered into a joint venture and established HPPC to acquire the College Hill Division. Pegasus and Hain jointly owned HPPC, Hain owning, initially, slightly more than 50%.  Irwin Simon ("Simon"), Ira Lamel ("Lamel") and Benjamin Brescher ("Brescher"), represented Hain

---

[1]    In a letter dated July 7, 2011, plaintiff requested that the reply declaration of Robert P. Lynn, Jr., submitted in support of HPPC's summary judgment motion, be ignored because Lynn, counsel for HPPC, asserts facts of which he does not have personal knowledge.  Fed. R. Civ. P. 56(c)(4).  In so far as Lynn's reply declaration presents legal arguments or summarizes facts of which he does not have personal knowledge, it has not been relied upon in this Opinion.  But the Court will consider those portions that supply facts regarding the parties' discovery process in this action.

on the HPPC board of directors ("HPPC Board").  Representing
Pegasus on the HPPC Board were Wiggins and Rodney Cohen
("Cohen").  After Cohen's resignation from the HPPC Board
sometime in 2008, David Cunningham ("Cunningham") joined in his
place.

Upon HPPC's formation, Wiggins was named chairman of the
HPPC Board, but continued to serve as a consultant to Pegasus on
HPPC and other ventures.  During this time, Wiggins billed the
time he spent on HPPC matters to Pegasus.  Wiggins claims that
Pegasus then billed HPPC for his services to the joint venture.
Simon, on the other hand, claims that Pegasus was only
reimbursed by HPPC for Wiggins's expenses, and that HPPC Board
members' time was not charged to HPPC.

On March 4, 2008, Wiggins made a presentation to the HPPC
Board during a meeting in Minneola, New York, about the
acquisition of Pilgrim's Pride.  The HPPC Board approved the
acquisition, and appointed Wiggins the CEO of HPPC.  Wiggins did
not make any mention at the HPPC Board meeting that he wanted
HPPC to agree to a one-year severance payment in the event of
his discharge as CEO.

Wiggins does not have an employment contract reduced to
writing, but he did discuss his requests about compensation with
certain HPPC Board members.  On March 4, prior to the HPPC Board
meeting, Wiggins met with Cohen, then a member of the HPPC

3

Board; Cunningham, who was not yet a member of the HPPC Board; and Shaun Collyer ("Collyer"), a Pegasus employee also not on the HPPC Board.  In this meeting, Wiggins relayed his request that he be compensated by HPPC no less than what he was receiving from Pegasus as a consultant, as well as for a one-year severance payment.  Cohen and Cunningham let him know he would need approval from the HPPC Board for these requests.  Wiggins claims that Cohen and Cunningham informed him that they supported his request for a severance payment, but they do not recall telling him this.  Cunningham testified that the HPPC Board did not approve Wiggins's request for a severance payment.

After the March 4 HPPC Board meeting, Wiggins met one-on-one with Simon.  Wiggins claims that during their conversation, Simon agreed to his request for a one-year severance payment.  Simon, on the other hand, testified that he does not recall discussing a severance payment with Wiggins.

Wiggins does not have any documentation that he was granted a one-year severance payment during his employment at HPPC.  Nor was he ever told that there was a HPPC Board meeting at which his severance payment request was approved.  Cunningham testified only that he had conversations with Lamel and Simon agreeing to Wiggins's salary amount and that the HPPC Board also agreed that he should be given an opportunity to receive a

bonus, based on the performance of the business and at the discretion of the HPPC Board.

Between March and July 2008, Wiggins began serving as the CEO of HPPC, but continued to be paid by Pegasus until July 1, when Wiggins completed an employment application form with HPPC, was put on HPPC's payroll, and began taking a salary from that company.  July 1, 2008 was the first day of HPPC's 2009 fiscal year.

II. Subsequent Discussions About HPPC Employee Benefits

Sometime after the acquisition of Pilgrim's Pride, Wiggins discussed putting into place a management equity plan at HPPC with Cunningham, Cohen and Collyer.  In April 2008, Cunningham was involved in discussions about a possible HPPC management equity plan with other HPPC Board members.  On August 13, Wiggins sent Cunningham an email asking about the status of the development of a management equity plan.  Cunningham responded by email the next day that he was still trying to get such a plan approved by the HPPC Board.  Wiggins admits that he does not know if HPPC ever adopted an equity plan, and that no one ever told him that the HPPC Board had agreed to such a plan.[2]

---

[2]    Wiggins attempts to change this testimony through his affidavit, signed after his deposition, wherein he states that Simon and Cunningham "affirmatively told me that I had been given a grant of 5% of HPPC."  Not only does this testimony contradict the remaining evidence in this case, but "[i]t is well settled in this circuit that a party's affidavit which

Cunningham explained that as "significant losses" were incurred by HPPC, the discussion of a management equity plan died out. Simon confirmed that no management equity plan was ever put into place, and testified that as of March 2011, HPPC was still wholly owned by Hain and Pegasus because no stock had ever been distributed to employees.

On September 8, 2008, Wiggins emailed Lamel and Cunningham a proposal for fiscal year 2008 bonuses for HPPC employees. This proposed bonus chart did not list any 2008 bonus for Wiggins, although his name and salary is listed alongside other HPPC employees.  The minutes from the September 10 HPPC Board meeting indicate that Collyer was directed to finalize the employee 2008 bonuses with Lamel and Cunningham.

Wiggins stated that he discussed his own 2008 bonus with Cunningham, and that he agreed that a $100,000 bonus, as suggested by Wiggins, was an appropriate amount.  But Wiggins was never informed if his 2008 bonus was ever discussed at a HPPC Board meeting.[3]  Cunningham recalled that 2008 bonuses for

---

contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."  Estate of Hamilton v. City of New York, 627 F.3d 50, 54 (2d Cir. 2010) (citation omitted).  Wiggins's affidavit, therefore, does not create a disputed issue of fact.

[3]  Wiggins claims in his declaration that "Collyer subsequently informed me that the Board had decided to give me a bonus for fiscal year 2008 of $100,000."  As with his declaration testimony about the proposed management equity plan,

employees were paid, but does not recall if a 2008 bonus amount was set for Wiggins.  Lamel and Cohen could also not recall if a bonus amount for Wiggins was ever discussed or approved.

On February 19, 2009, Wiggins signed a memo regarding HPPC's employee vacation policy.  This policy states that unused vacation would only be paid out to those that voluntarily left the company.[4]

While CEO of HPPC, Wiggins worked primarily out of its corporate headquarters in New Oxford, Pennsylvania, living out

---

this testimony is unsupported by any other evidence, and, in contradicting prior deposition testimony, cannot be used by Wiggins to create a disputed issue of fact.  Estate of Hamilton, 627 F.3d at 54.

[4]    Wiggins challenges the introduction of this memo (the "2009 Memo") into evidence because it was produced after the close of fact discovery.  He does not cite any authority for the exclusion of the 2009 Memo.  Pursuant to Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or . . . as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." The 2009 Memo was produced on May 11, 2011, 11 days after the official end of fact discovery, but during a time when clean-up discovery was still underway.  Wiggins made a document production on May 10 and a deposition of Roxanne Parmele ("Parmele"), the vice president of human resources of HPPC, was scheduled for May 17.  In fact, the 2009 Memo was produced shortly after HPPC's counsel was notified by Parmele that she found it in preparation for her May 17 deposition.  It was produced before the motion for summary judgment was filed and more than a month before Wiggins signed an affidavit in opposition to the motion for summary judgment.  Therefore, the delay in production was both substantially justified and harmless.  Furthermore, its production was appropriate pursuant to HPPC's obligations under Fed. R. Civ. P. 26(e)(1).

of a nearby hotel.  On the weekends, he lived at his residence
in Florida.  Between July 1, 2008 and April 21, 2009, Wiggins
worked between 30 and 45 days in New York locations,[5] and less
than five days at an HPPC location in North Carolina.  For tax
purposes, Wiggins indicated that his residence was in Florida.

III. Wiggins's Discharge

Wiggins was fired from HPPC by Cunningham on April 21, 2009
after the HPPC Board discussed and agreed that he should be
removed.  This was not unexpected.  HPPC was performing "fairly
significant[ly]" "under budget" in the first few months of 2009.

Following his discharge, Wiggins spoke with both Cohen and
Cunningham in separate conversations about getting a severance
payment.  He also corresponded by email with Cohen and
Cunningham in May and June 2009 about a severance payment.  In
emails of July and August 2009, Cunningham informed Wiggins that
he had to meet with the HPPC Board to get a consensus on the
severance payment, but never let Wiggins know the result of
those meetings.  Cohen also never told Wiggins that there was an
agreement from the HPPC Board about a severance payment.
Cunningham testified that the HPPC Board discussed Wiggins's

---

[5]    In his affidavit, Wiggins stated that if one includes the
period between March 2008 and July 1, 2008, he spent six to nine
weeks working in New York while CEO of HPPC.  As noted below,
the amount of time he spent working in New York has no bearing
on the resolution of his claims.

request for a severance, but that the directors determined that
HPPC had no further obligations to Wiggins.


DISCUSSION

      HPPC argues that it is entitled to summary judgment because
the undisputed facts show that there was no contract formed
between it and Wiggins establishing that Wiggins had a right to
a 2008 bonus, a one-year severance payment, participation in a
management equity plan, or payment for unused vacation (the
"Denied Benefits").  Furthermore, HPPC argues that because
Wiggins worked primarily in Pennsylvania for a company organized
under the laws of Delaware and operating principally in
Pennsylvania, he is not entitled to bring claims under the New
York Labor Law.  Because Wiggins has not raised any genuine
disputes of material fact to support the formation of a contract
with HPPC to provide him the Denied Benefits, HPPC's motion for
summary judgment is granted.

I.   Summary Judgment Standard

      A motion for summary judgment may not be granted unless all
of the submissions taken together "show that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(a); see El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933
(2d Cir. 2010).  The moving party bears the burden of

demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); El Sayed, 627 F.3d at 933. When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot "merely rest on the allegations or denials" contained in the pleadings.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).

II.  Breach of Contract

HPPC argues that it is entitled to summary judgment against Wiggins's breach of contract claims because the undisputed evidence shows there was no contract regarding the Denied Benefits.  "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by

10

the plaintiff, (3) breach by the defendant, and (4) damages."[6]

Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).

> To create a binding contract, there must be a
> manifestation of mutual assent sufficiently definite
> to assure that the parties are truly in agreement with
> respect to all material terms.  There must be an
> objective meeting of the minds sufficient to give rise
> to a binding and enforceable contract.  A mere
> agreement to agree, in which a material term is left
> for future negotiations, is unenforceable.

Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 95 (2d Cir. 2007) (citation omitted).

> The existence of a binding contract is not dependent
> on the subjective intent of the parties.  In
> determining whether the parties entered into a
> contractual agreement and what were its terms, it is
> necessary to look, rather, to the objective
> manifestations of the intent of the parties as
> gathered by their expressed words and deeds.
> Generally, courts look to the basic elements of the
> offer and the acceptance to determine whether there is
> an objective meeting of the minds.

Minelli Const. Co., Inc. v. Volmar Const., Inc., 82 A.D.3d 720, 721 (N.Y. App. Div. 2011) (citation omitted).

Under Delaware law,[7] the authority to enter into contracts and make executive compensation decisions on behalf of a

---

[6]     "Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state.  It is therefore appropriate for this Court to apply New York law."  Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 121 n.5 (2d Cir. 1998).

[7]     HPPC is incorporated in Delaware and "[q]uestions relating to the internal affairs of corporations . . . are generally decided in accordance with the law of the place of

corporation is vested in the board of directors.   In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d 106, 138 (Del. Ch. 2009); 8 Del. C. § 141; see also 2 Fletcher Cyc. Corp. § 392 ("when a corporation's power is vested in the directors or trustees to do particular acts or generally manage its affairs, it is vested in them not individually but as a board").

The undisputed evidence shows that there was never any contract by which HPPC bound itself to provide Wiggins any of the Denied Benefits.  While Wiggins asserts that he had conversations with directors regarding each of the Denied Benefits, other than unused vacation, there is no any evidence supporting an inference that the HPPC Board assented to grant him these Denied Benefits, and there is evidence that the HPPC Board came to an explicit decision to reject his requests for a severance payment and participation in a management equity plan. The lack of assent by the HPPC Board with respect to each Denied Benefit will be analyzed more below.

Wiggins correctly contends that HPPC could have committed to provide the Denied Benefits to him by oral agreement, thereby creating a binding contract.  In the absence of a written

---

incorporation."   United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000).

contract, a court evaluates whether the parties agreed to be bound by an oral agreement by considering

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Powell v. Omnicom, 497 F.3d 124, 129 (2d Cir. 2007).  In the case of the Denied Benefits, only the third factor need to be considered -- not only is there no evidence that all of the terms have been agreed upon, there is no evidence that there was an agreement by HPPC on any of the terms of the Denied Benefits. In other words, HPPC did not just fail to agree to be bound by oral agreement -- it did not reach any agreement with regard to the Denied Benefits.  Therefore, while HPPC could have reached an oral agreement to provide Wiggins with the Denied Benefits, there is no evidence of any agreement at all -- oral or written.

A.   One-Year Severance Payment

It is undisputed that there is no documentation reflecting a request by Wiggins for a severance payment prior to his discharge, and that the HPPC Board never voted on or agreed at a board meeting to a one-year severance payment to Wiggins in the event of his discharge.  Cunningham testified that the HPPC Board approved Wiggins's salary and that he would be given the opportunity to receive a bonus, but that it never approved a

severance payment.  In urging that summary judgment should be denied on his claim that HPPC breached its agreement to provide him a severance payment, Wiggins relies on his contention that he received the consent of Cohen, Cunningham and Simon for his severance payment request.  Cohen, Cunningham, and Simon dispute this characterization.  But even assuming that they did, their expressions of support do not bind HPPC.

Wiggins makes the argument, unelaborated or supported by case law, that the individual directors with whom he spoke had apparent authority as agents of HPPC to enter into contracts on its behalf.  But,

> an agent can bind the principal on an apparent
> authority basis only if the third person involved
> reasonably concludes that the agent is acting for the
> principal.  In dealing with the agent the third person
> must act with ordinary prudence and reasonable
> diligence, in ascertaining the scope of the agent's
> authority and he will not be permitted to claim
> protection if he ignores facts illustrating the
> agent's lack of authority.

Int'l Boiler Works Co. v. Gen. Waterworks Corp., 372 A.2d 176, 177 (Del. 1977) (citation omitted).  Indeed, "[a]pparent authority exists when a principal, either intentionally or by lack of ordinary care, induces a third party to believe that an individual has been authorized to act on its behalf."  Highland Capital Mgm't LP v. Schneider, 607 F.3d 322, 328 (2d Cir. 2010) (citation omitted); Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v.

Schreiber, 407 F.3d 34, 56 (2d Cir. 2005) ("A principal may be bound by the actions of an agent on the basis of apparent authority only where it is shown that a third party . . . reasonably relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal.") (citation omitted).

Wiggins makes no argument that HPPC, the principal that Wiggins seeks to hold liable, acted in some way to induce him to believe that one or all of Cohen, Cunningham or Simon could make an agreement on behalf of the company without acting through the HPPC Board.[8]  Indeed, the undisputed evidence is that the HPPC Board discussed major topics at board meetings and made decisions together on the acquisition of Pilgrim's Pride, the possibility of enacting a management equity plan, the discharge of Wiggins and employee bonuses.  Wiggins was informed that proposals for bonuses and a management equity plan needed to be reviewed by the HPPC Board and that they were topics of HPPC Board meetings.  Lamel testified that whereas some decisions

---

[8]   At no point does Wiggins argue that HPPC actually appointed a particular individual to be its agent with regard to decisions about his compensation.  Nor could he -- the bylaws of HPPC state that the Board of Directors retains the power to determine officers' compensation, and does not provide for the delegation of that authority with respect to the compensation of the CEO. The bylaws only allow delegation of decisions regarding compensation of subordinates to a superior officer.  As Wiggins was subordinate to no other officer of the company, there was no one to whom, pursuant to its bylaws, the HPPC Board could delegate decisionmaking concerning his compensation.

could be made through just two directors, one representing each of Hain and Pegasus, any such decision would need to have been delegated to them or approved by the HPPC Board to be made effective.   In discussing his severance payment request, Cohen and Cunningham informed Wiggins that they would need to seek approval from the HPPC Board -- Wiggins only adds to the undisputed evidence a claim that they said they "supported" his request, which suggests that they would stand by him when he made a request to the HPPC Board, not that they were entering into a contract with him on behalf of the company.

Wiggins makes much of the fact that the HPPC Board did not always issue written board resolutions or record minutes of its meetings, but this does not support his contention that he could rely on the support of individual directors for his requests about executive compensation to bind the company.   In this context, Wiggins, as a member of the HPPC Board, could not reasonably conclude that individual HPPC Board members were agents who could individually make such decisions for the company.

B.   2008 Bonus

The undisputed evidence, including Wiggins's own testimony, shows that the HPPC Board never agreed to a 2008 bonus for Wiggins.   The fact that the HPPC Board agreed that he should be given the opportunity to receive a bonus based on the company's

16

performance and at the discretion of the HPPC Board is not an agreement to give Wiggins a specific bonus. Nor is the fact that the HPPC Board referred to a plan Wiggins drafted with recommendations for HPPC employee 2008 bonuses helpful to him, as this plan did not include a bonus amount for Wiggins himself.

Wiggins claims that he discussed a 2008 bonus for himself with Cunningham, and that Cunningham agreed that a roughly $100,000 bonus was appropriate. Even if this is true, it fails to demonstrate an agreement between Wiggins and HPPC on his 2008 bonus. For the same reasons already mentioned, Cunningham did not serve as an agent able to bind HPPC to an agreement to provide Wiggins with a 2008 bonus. The other HPPC Board members testified that they don't recall approving such a bonus, and even Wiggins testified that he was never informed that his 2008 bonus was discussed at a HPPC Board meeting, much less approved. Nor is there any evidence that Wiggins inquired of any board member about the status of his 2008 bonus payment between September 2008 and May 2010, when the complaint in this action was filed.[9] Without any evidence supporting the creation of an

---

[9] This testimony is all consistent with the undisputed fact that Wiggins was not even an employee of HPPC during its 2008 fiscal year, and only was added to HPPC's payroll on July 1, 2008, as Wiggins himself testified. Wiggins was paid directly by Pegasus as a consultant up until that date. But, even if there were a disputed issue of fact regarding his employment status prior to July 1, there is no material dispute that there was no agreement by HPPC to pay him a 2008 bonus.

17

agreement between Wiggins and HPPC about a 2008 bonus, Wiggins should not have relied on some metaphysical doubt that one might exist to bring this claim or to resist summary judgment.

Wiggins claims that the HPPC Board members gave inconsistent testimony about his 2008 bonus.  This is not true -- each stated that he could not recall any approval for a 2008 bonus for Wiggins.  The lone contrary testimony is from Collyer, a former Pegasus employee who was never a board member and whose testimony contradicts that of Wiggins himself.[10]

C.   Management Equity Plan

There is also no genuine dispute of material fact that a management equity plan was discussed by the HPPC Board but never implemented.  Wiggins's own testimony that he does not know if the HPPC Board ever confirmed a management equity plan confirms the more detailed testimony by Cunningham that a management equity plan was discussed between April and August 2008, but was never approved due to the declining performance of HPPC.  The testimony from HPPC Board members on this topic, far from being vague, was uniformly clear that a management equity plan had been discussed but never approved.  This testimony is also supported by the testimony by Simon that the company's stock

---

[10]   As noted above, Wiggins's affidavit testimony that he was informed that he was to receive a 2008 bonus contradicts his earlier deposition testimony, and thus cannot be used to raise a disputed issue of material fact.

remains entirely in the hands of Hain and Pegasus -- had a
management equity plan been approved, some of the stock would
now be in the hands of executives.  Lacking any evidence
suggesting that a management equity plan was approved, HPPC is
entitled to summary judgment on this claim.

    D.   Unused Vacation

    No evidence has been presented to suggest that HPPC made
any agreement with Wiggins or ever enacted a policy by which its
employees would be entitled to a payment for unused vacation in
the event that they were discharged involuntarily.  In fact, the
2009 Memo bearing Wiggins's signature states that one who is
fired, as he was, is not entitled to a payment for unused
vacation.  The declaration of Parmele confirms that this was the
policy of HPPC.

    Wiggins does not make any argument why HPPC's summary
judgment motion should be denied as to his claim for payment for
unused vacation other than his attempt to exclude the 2009 Memo
from consideration.  Even if the 2009 Memo were excluded, the
remaining evidence would justify summary judgment.  The 2008
Memo, upon which Wiggins would rather rely, is silent about
payments regarding unused vacation.  Parmele's declaration,
which articulates the policy as that approved by Wiggins in the
2009 memo, would also still be in evidence.  In the absence of
any evidence of a policy that would grant Wiggins a payment for

unused vacation after being involuntarily discharged, Wiggins cannot claim that there is a genuine dispute about the existence of such a policy at this stage.

III. New York Labor Law Claim

Wiggins's complaint vaguely refers to various sections of the New York Labor Law ("NYLL") in bringing his second claim against HPPC.[11]  He cites §§ 190 et seq., indicating that his claim comes under Article 6, N.Y. Lab. Law §§ 190-199A.  He also refers to relief available under § 198(1-a) and § 191, but states that his claim is "not limited" to these sections.

Pursuant to § 191, certain kinds of employees can bring a claim for an employer's failure to pay their wages on a certain schedule.  Under § 193, employees may have a claim against an employer's unlawful deductions from their wages.  Section 198(1-a) allows plaintiffs who prevail under wage claims to recover, in addition to any underpayment of wages, attorney's fees, prejudgment interest and liquidated damages.  The other sections of Article 6 either do not provide employees with a cause of action against an employer or provide for claims quite unrelated to Wiggins' allegations.

Wiggins has been no more specific about the nature of his NYLL claims in opposing this motion for summary judgment.  It is

---

[11]    This Opinion finds it unnecessary to address whether Wiggins had sufficient contacts with New York to seek protection under the NYLL.

incumbent on a plaintiff to give fair notice to a defendant of its claim, and for this reason alone HPPC would be entitled to summary judgment on any NYLL claim.  But, there are additional grounds as well for granting summary judgment to HPPC.

Executives such as Wiggins are not entitled to bring claims under § 191 of the NYLL, as the statute specifically excludes them.  Pachter v. Bernard Hodes Group, Inc., 10 N.Y.3d 609, 615-16 (2008).  Although executives may be able to bring claims for unauthorized deductions from wages pursuant to § 193, they may not bring a claim under § 193 for deductions of non-wage benefits.  Wagner v. Edisonlearning, Inc., No. 09 Civ. 831 (SAS), 2009 WL 1055728, at **2-3 (S.D.N.Y. Apr. 17, 2009); Fraiberg v. 4Kids Entertainment, Inc., 75 A.D.3d 580, 583 (N.Y. App. Div. 2010).[12]  Furthermore, Wiggins's allegations do not state a claim under § 193 because that section "has nothing to do with failure to pay wages or severance benefits, governing instead the specific subject of making deductions from wages." Monagle v. Scholastic, Inc., No. 06 Civ. 14342 (GEL), 2007 WL 766282, at *2 (S.D.N.Y. Mar. 9, 2007); Strohl v. Brite Adventure Center, Inc., No. 08 CV 259(RML), 2009 WL 2824585, at *9

---

[12]   Wiggins's claimed participation in a management equity plan and 2008 bonus, which was to be granted at the discretion of the board and based on the performance of the company, do not qualify as "wages" under Article 6 of the New York Labor Law. Truelove v Northeast Capital & Advisory, 95 N.Y.2d 220, 223-24 (2000).

(E.D.N.Y. Aug. 28, 2009).  Wiggins is also not entitled to the

remedies available in § 198(1-a), which does not itself provide

a cause of action against an employer independent of an

underlying Article 6 wage claim.  See Martz v. Incorporated

Village of Valley Stream, 22 F.3d 26, 30 (2d Cir. 1994)

("Section 198 merely provides employees with a mechanism to

recover costs and expenses in connection with a successful

litigation against an employer for failure to pay wages.");

Gottlieb v. Kenneth D. Laub & Co., Inc., 82 N.Y.2d 457, 459

(1993) ("the intent of [§ 198(1-a)] is that the attorney's fees

remedy provided therein is limited to wage claims  based upon

violations of one or more of the substantive provisions of Labor

Law [A]rticle 6").


CONCLUSION

    HPPC's May 27, 2011 motion for summary judgment is granted.

The Clerk of Court will enter judgment for HPPC and close this

action.


Dated:    New York, New York
          November 9, 2011

                              _____
                                   DENISE COTE
                          United States District Judge